IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PAMELA CAVER, *et al.*, | ) |
| | ) |
|     **Plaintiffs,** | ) |
| | ) |
| v. | ) CIVIL ACTION 15-0129-WS-C |
| | ) |
| CENTRAL ALABAMA ELECTRIC | ) |
| COOPERATIVE, | ) |
| | ) |
|     **Defendant.** | ) |

**ORDER**

This matter comes before the Court on defendant's Motion to Dismiss (doc. 2). The Motion has been briefed and is now ripe. Also pending is Plaintiffs' Motion for Certification of Interlocutory Appeal (doc. 36).

**I.  Background.**

Plaintiffs, Pamela Caver, Christine Grandison and Dexter Grandison, brought this putative class action against defendant, Central Alabama Electric Cooperative ("CAEC"), asserting claims for declaratory judgment and breach of contract. CAEC is a rural electric distribution cooperative organized under Alabama law, of which plaintiffs are alleged to be current or former members. According to the well-pleaded factual allegations of the Complaint, "CAEC has repeatedly and consistently failed to refund excess revenue to its members. Generally, CAEC holds excess revenue from any given year for decades, only purporting to refund it when many of the members who are entitled to that year's refund cannot be found." (Doc. 1, Exh. A, ¶ 12.) The Complaint further alleges that, rather than issuing cash refunds of excess revenue each year, CAEC "segregates it and assigns a portion of it to each of its members through individual 'capital credit accounts.'" (*Id.*, ¶ 11.)

Plaintiffs' theory of relief is that CAEC's practice of withholding these funds violates an Alabama statute mandating that excess revenues "be distributed by the cooperative to its members as, and in the manner, provided in the bylaws, either as patronage refunds … or by way of general rate reductions, or by combination of such methods." Alabama Code § 37-6-20.

Plaintiffs seek a declaration (including an order of restitution) that CAEC is in violation of § 37-6-20, plus damages on a breach of contract claim alleging that CAEC's bylaws are a contract that "incorporates the … legal obligations under Alabama Code Section 37-6-20 to refund excess revenue each year." (Doc. 1, Exh. A, ¶ 28.)[1]

CAEC has moved to dismiss this Complaint in its entirety on the following grounds: (i) plaintiffs' claims are preempted by the Rural Electrification Act and its accompanying regulations; (ii) plaintiffs do not have a legal right to annual cash distributions under the cited Alabama statute; (iii) plaintiffs agreed to return cash refunds to CAEC in exchange for capital account credits; and (iv) plaintiffs have neither a private right of action nor standing to sue CAEC. Plaintiffs vigorously oppose dismissal on each of these grounds.

**II.   Analysis.**

   *A.   Legal Standard.*

Defendant's Motion posits that the Complaint fails to state claims upon which relief can be granted, and therefore is properly analyzed under Rule 12(b)(6), Fed.R.Civ.P. To withstand Rule 12(b)(6) scrutiny and comply with the minimum pleading requirements of Rule 8(a), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[ ][its] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 (11th Cir. 2012). Thus, minimum pleading standards "require[ ] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly* / *Iqbal* principles require that a complaint's allegations be "enough to

---

[1]   In briefing the Motion to Dismiss, plaintiffs allude to "a claim for unjust enrichment (Count Three), because CAEC has knowingly retained money that, under clear Alabama statute, belongs to the members." (Doc. 25, at 5.) The Complaint on file in this case is devoid of any such unjust enrichment claim; rather, it is limited to the declaratory/injunctive and breach of contract causes of action identified *supra*. (*See* Doc. 1, Exh. A.)

raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010) (citations omitted). "To survive a 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations, ... but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010) (citations and internal quotation marks omitted).

For purposes of this Rule 12(b)(6) analysis, the Court accepts as true all well-pleaded factual allegations of the Complaint, and draws all reasonable inferences in the plaintiffs' favor. *See, e.g., Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (in reviewing Rule 12(b)(6) motion, court must "accept[] the facts alleged in the complaint as true," "draw[] all reasonable inferences in the plaintiff's favor," and "limit[] our review to the four corners of the complaint"). Notwithstanding this deference to plaintiffs' pleading at the Rule 12(b)(6) stage, it is also true that "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011).

**B.     Section § 37-6-20 Does Not Require an Annual Cash Refund.**

The central argument animating CAEC's Motion to Dismiss is that the Alabama statute on which plaintiffs' claims rest "establishes as a matter of law that the Plaintiffs have no legal or property right to demand a cash distribution of patronage capital at any time." (Doc. 2, at 16.) This contention calls for in-depth scrutiny of the terms and features of Alabama Code § 37-6-20, the statute animating plaintiffs' claims.

The basic structure of § 37-6-20 is to identify various categories of items that an electric cooperative may subtract from its revenues for any fiscal year, and to provide for "distribution" of the remainder (referred to herein as "Excess Revenues") to the cooperative's members on an annual basis. Per the express statutory language, Excess Revenues equal "[r]evenues of a cooperative for any fiscal year," less amounts necessary for each of the following: (i) "to defray expenses of the cooperative and of the operation and maintenance of its facilities during such fiscal year;" (ii) "to pay interest and principal obligations of the cooperative coming due in such fiscal year;" (iii) "to finance or to provide a reserve for the financing of, the construction or acquisition by the cooperative of additional facilities to the extent determined by the board of trustees;" (iv) "to provide a reasonable reserve for working capital;" (v) "to provide a reserve for the payment of indebtedness of the cooperative maturing more than one year after the date of the

incurrence of such indebtedness in an amount not less than the total of the interest and principal payments in respect thereof required to be made during the next following fiscal year;" and (vi) "to provide a fund for education in cooperation and for the dissemination of information concerning the effective use of electric energy and other services made available by the cooperative." Alabama Code § 37-6-20.

Having defined what Excess Revenues are, the statute then directs that such funds "***shall be distributed by the cooperative to its members as, and in the manner, provided in the bylaws, either as patronage refunds*** prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year ***or by way of general rate reductions***, or by combination of such methods." *Id.* (emphasis added). In both their Complaint and their brief opposing the Rule 12(b)(6) Motion, plaintiffs assert that § 37-6-20 obligates CAEC to distribute Excess Revenues to its members on an annual basis via cash payment or rate reduction.[2] By contrast, CAEC adopts the position that nothing in § 37-6-20 requires it to make annual cash refunds of Excess Revenues to its members, and that the statute allows it instead to distribute such Excess Revenues via accounting credits retired by the Board as cash payments many years later.[3] This dispute is absolutely central to this litigation. The premise of plaintiffs' Complaint is that § 37-6-20 requires CAEC to pay out annual cash distributions of Excess Revenues, and that CAEC's practice of allocating those funds to "individual capital credit accounts" for its members and returning "excess revenues to its members as late as 30 years after these credits are earned"

---

[2] *See* doc. 25, at 4 ("The statute mandates distribution of a refund, and discretion lies only in the method of refunding (rate reduction, cash payment, or combination of methods, which are the only methods recognized by the statute)."); doc. 25, at 15 ("The Alabama statute, by contrast, gives cooperatives more limited discretion to distribute annual Excess Revenues in Patronage Capital – distributions must be in cash or by general rate reductions or a combination of methods."). The "rate reduction" option does not appear germane to this dispute, the crux of which is whether CAEC violates the statute by making distributions via accounting credits rather than cash payments. Thus, this Order devotes scant attention to the "rate reduction" means of complying with § 37-6-20 because no one is arguing that CAEC actually utilized that mechanism here, or that CAEC's attempts to do so somehow ran afoul of the statute.

[3] *See* doc. 2, at 11 ("Nothing in the Alabama statute in question establishes any right to a cash refund of 'Patronage Capital.'"); doc. 27, at 12 ("The statute does not prohibit that distribution taking the form of a credit to be retired as cash on a 30-year FIFO method over which time rates were reduced by the use of the capital to reduce borrowing costs.").

constitutes "a clear violation of Section 37-6-20." (Doc. 1, Exh. A, ¶¶ 11-12.) CAEC counters that the statute contains neither a requirement of cash distributions nor a prohibition on credit-based distributions. As a pure question of law, this issue of statutory interpretation (*i.e.*, whether § 37-6-20 allows distribution of Excess Revenues by accounting credits or whether it requires such distributions to be made in cash) is well suited for resolution via Rule 12(b)(6) Motion.

In examining § 37-6-20, the Court derives guidance from relevant canons of statutory construction.[4] Courts have long recognized that their "authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction." *Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330, 1334 (11th Cir. 2015) (citation omitted). Federal courts presume that the legislature "said what it meant and meant what it said." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (citations omitted). To discern a statute's plain meaning, "[i]n the absence of a statutory definition of a term, we look to the common usage of words for their meaning." *Id.* (citations omitted). Courts "must interpret a statute in a manner consistent with the plain language of the statute unless doing so would lead to an absurd result." *United States v. Wilson*, 788 F.3d 1298, 1310 (11th Cir. 2015) (citation and internal quotation marks omitted).

Again, the crucial language of the relevant Alabama statute provides that when electric cooperatives accrue Excess Revenues in a fiscal year, such revenues "shall be distributed by the cooperative to its members as, and in the manner, provided in the bylaws, either as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year or by way of general rate reductions." Ala. Code § 37-6-20. Pursuant to the plain language of the statute, then, an electric cooperative must distribute Excess Revenues "as, and in the manner, provided in the bylaws." CAEC's Bylaws thus become

---

[4] Of course, in so doing, the undersigned remains cognizant of the limitations on the utility of these principles. After all, "[t]he canons of construction are interpretative tools, … which are no more than rules of thumb that help courts determine the meaning of legislation." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001) (citation and internal quotation marks omitted).

significant to the inquiry.[5] It is undisputed that the key passage of the CAEC Bylaws relating to distribution of Excess Revenues reads as follows:

> "All such amounts in excess of operating costs and expenses at the moment of receipt by the Cooperative are received with the understanding that they are furnished by the patrons, members and non-members alike, as capital. The Cooperative is obligated to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses. The books and records of the cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the patron's capital account …. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.
>
>     *        *        *
>
> "The Board of Trustees shall determine the method, basis, priority and order of making retirements through capital credits, from time to time, for all amounts heretofore and hereafter furnished as capital …."

(CAEC Bylaws, § 8.02 (adopted August 11, 2006).)

To recap, then, plaintiffs' claims in this lawsuit are that CAEC is operating in violation of § 37-6-20 by failing to pay out Excess Revenues to its members in the form of cash distributions on an annual basis. On its face, the statute provides that Alabama electric cooperatives such as CAEC must distribute Excess Revenues "as, and in the manner, provided in the bylaws." CAEC's Bylaws state that such funds are to be paid out in the form of credits to each patron's capital account, with those credits being tracked in CAEC's books and records and ultimately retired by the Board of Trustees in its discretion. Thus, CAEC's Bylaws (to which § 37-6-20

---

[5] Plaintiffs' Complaint specifically recites and relies on CAEC's Bylaws as the factual basis of the breach of contract claim asserted as Count Two. (Doc. 1, Exh. A, at ¶ 27.) Moreover, the contents of CAEC's Bylaws appear undisputed; indeed, plaintiffs challenge neither the veracity nor the accuracy of what CAEC describes as its Bylaws. As such, CAEC's Bylaws are properly considered at this time without converting the Motion to Dismiss into a motion for summary judgment. *See, e.g., Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed," in the sense that "the authenticity of the document is not challenged"); *Pouyeh v. Bascom Palmer Eye Institute*, 2015 WL 3406538, *6 (11th Cir. May 28, 2015) ("A court may consider a document that has been attached to a motion to dismiss … if it is central to the plaintiff's claims and its authenticity is not challenged.").

defers in establishing the manner of distribution of Excess Revenues) provide for a distribution method in the form of accrual of patronage credits in capital accounts, with such credits to "have the same status as though they had been paid to the patron in cash … and the patron had then furnished the Cooperative corresponding amounts for capital."  Certainly, then, nothing in the "as, and in the manner, provided in the bylaws" clause of § 37-6-20 or the corresponding portions of CAEC's Bylaws would lend support to plaintiffs' theory that CAEC is required to make cash payouts of Excess Revenues every year.[6]

Plaintiffs' position is further weakened by a straightforward, plain-language reading of other relevant provisions of § 37-6-20.  Recall that the statute requires that Excess Revenues for a fiscal year "shall be distributed" to a cooperative's members "either as patronage refunds … or by way of general rate reductions, or by combination of such methods."  Nowhere does the statute use the word "cash" or expressly forbid electric cooperatives from using methods other than cash (such as accounting credits) to "distribute" the required distributions.  Nothing in the plain language used in the statute would impose a specific requirement that all such distributions be made in cash.  Plaintiffs offer no persuasive argument otherwise; instead, they appear to assume that such a statutory mandate exists.  In that regard, plaintiffs' principal argument is that § 37-6-20 "requires that the annually created pool be drained – the statute's word is 'distributed.'"  (Doc. 25, at 3.)  But a common-sense, plain-meaning construction of the term "distributed" does not confine it to any one method of distribution.  A distribution is still a distribution whether made via cash or accounting credits.  Either way, the pool would be drained, regardless of whether the money is physically gone or simply segregated in CEAC's accounting records.  In short, nowhere in their brief do plaintiffs identify a statutory, textual basis for their

---

[6] In their briefs, the parties argue as to whether the patronage capital credits described in the CAEC Bylaws are or are not identical or functionally equivalent to the concept of Excess Revenues embedded in Alabama Code § 37-6-20. (*See* doc. 25, at 3, 14, 19-20 & n.7; doc. 27, at 1-4.)  The crucial point for purposes of this Order is not that Excess Revenues and patronage capital are the same (the Court need not and does not make any such finding at this stage), but rather that Excess Revenues are at least a subset of patronage capital.  In other words, CAEC's system (as described in its Bylaws) of issuing patronage credits and recording those credits in its members' capital accounts would include what § 37-6-20 calls Excess Revenues. Whether patronage credits would also include types of funds over and above Excess Revenues (and it appears highly probable that they would) is of no consequence to the pending Motion to Dismiss.

belief that CAEC's annual draining of its pool of Excess Revenues must take the form of direct cash payouts to members, or that draining the pool via patronage credits allocated to each member's capital account is impermissible under § 37-6-20.  Plaintiffs would have this Court import into the statute limitations, constraints and requirements that are not there.  Of course, a court interpreting a statute is not at liberty to engage in such judicial rewriting of its provisions to supplement, alter or improve upon what the legislature said.[7]

Upon examining the "distributed" and "manner" facets of § 37-6-20 collectively, the infirmities in plaintiffs' theory of liability are further exposed.  By its terms, the statute provides that electric cooperatives must distribute Excess Revenues to their members on an annual basis, in the manner provided in their bylaws, either as patronage refunds or general rate reductions.  As noted, there is no textual basis in § 37-6-20 for equating the term "distribute" with "make a cash payment."[8]  Moreover, the statute expressly defers to each cooperative's bylaws to

---

[7] *See, e.g., Dean v. United States*, 556 U.S. 568, 572, 129 S.Ct. 1849, 173 L.Ed.2d 785 (2009) ("we ordinarily resist reading words or elements into a statute that do not appear on its face") (citation omitted); *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1300-01 (11th Cir. 2010) ("Courts may not rewrite the language of a statute in the guise of interpreting it in order to further what they deem to be a better policy than the one Congress wrote into the statute."); *Wright v. Secretary for Dep't of Corrections*, 278 F.3d 1245, 1255 (11th Cir. 2002) ("Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them.").

[8] To be sure, § 37-6-20 provides that distributions shall be made "either as patronage refunds … or by way of general rate reductions."  Although they never offer any supporting explanation or reasoning, plaintiffs treat the phrases "patronage refund" and "cash payout" as synonyms.  Such an assumption is unwarranted.  Indeed, the term "patronage refund" is not defined in the statute, and the plain ordinary meaning of a "refund" encompasses concepts of distribution by either cash or credit.  Refunds may be issued in cash or in credit.  For example, modern consumers who return purchases to retailers are well accustomed to receiving refunds in the form of store credit, rather than cash.  Federal regulations governing Rural Utilities Service borrowers discuss "[i]nsurance policy refunds from mutual companies, in cash or as credits against subsequent purchases."  7 C.F.R. § 1767.41, at 505(1).  The Federal Trade Commission has written about the value of "specify[ing] requirements for making refunds by means other than cash, check, money order or credit."  79 Fed.Reg. 55615-01, at 55616.  The website of popular online payment service PayPal provides a litany of non-cash options describing how "refunds" may be "credited" to customers' accounts. www.paypal.com/us/webapps/helpcenter/helphub/article/?solutionId=FAQ1083&m=HTQ.  And plaintiffs' own brief describes a Tennessee statute as allowing cooperatives "to refund annual excess revenues … by either refunding in cash, reducing rates, or … holding the Patronage Capital and booking IOUs to the Members."  (Doc. 25, at 15.)  The point is that the word (Continued)

determine the "manner" in which the distributions are made.  Here, CAEC's Bylaws have established a manner of making annual distributions of Excess Revenues whereby patronage capital credits are posted to each member's capital account, with such credits to be retired over time in the Board's discretion.  Far from violating the statute, CAEC's Bylaws are a permissible exercise of the discretion bestowed upon the cooperative by § 37-6-20 to devise a method of distributing Excess Revenues as patronage refunds taking the form of accounting credits.

This construction of § 37-6-20 finds support in a pair of Alabama appellate decisions.  In *dicta*, the Alabama Court of Civil Appeals opined that "[e]ven though § 37-6-20 is not a taxing statute, it mandates that a cooperative return any excess advances to its members and **allows those returns to be made in the form of patronage credits**."  *State, Dep't of Revenue v. Mon-Cre Telephone Co-op., Inc.*, 702 So.2d 179, 182 (Ala.Civ.App. 1997) (emphasis added).  In another case, decided more than a decade earlier, the Alabama Court of Civil Appeals found no legal defects in an electric cooperative's system whereby "[a] separate amount is set up for each patron to indicate the capital furnished during a fiscal year. … If at the end of the fiscal year, the payments into the accounts exceed the actual expenses, there obtains a credit in the capital accounts of the patrons. … Such capital was an obligation to the member against the assets of the cooperative."  *State v. Pea River Elec. Co-op.*, 434 So.2d 785, 786 (Ala.Civ.App. 1983).  To be sure, *Mon-Cre* and *Pea River* were tax cases, rather than direct challenges by cooperative members seeking disgorgement of Excess Revenues under § 37-6-20.  Nonetheless, the point remains that Alabama appellate courts twice looked at, and twice found no fault with, rural electric cooperative practices of distributing Excess Revenues via capital credits (rather than making cash payments), in the context of legal analyses that expressly involved the "distributed"

---

"refund" does not irreducibly, automatically equate to "cash refund" in its everyday usage.  Innumerable examples can be found – both inside and outside the law – of "refunds" that are made via credit to an account rather than cash on the barrelhead.  Thus, plaintiffs' reading of the phrase "patronage refunds" in § 37-6-20 as meaning exclusively "cash refunds" misses the mark as a matter of statutory interpretation, because the common ordinary meaning of the term "refunds" embraces both cash and credit varieties.  The Court cannot and will not write in the word "cash" before "refund" in § 37-6-20 where the Alabama legislature did not.

language of § 37-6-20. These authorities, and the absence of any countervailing decisions identified by plaintiffs, further reveals the weakness of plaintiffs' legal theory.[9]

In light of the foregoing, the undersigned is of the opinion that plaintiffs' claims – which, again, are predicated on the notion that § 37-6-20 requires CAEC to pay out Excess Revenues to members in cash on an annual basis – fail, as a matter of law. As a matter of statutory interpretation, the Court finds that § 37-6-20 contains no such cash payout requirement, and no provisions forbidding distribution of Excess Revenues via capital credits, as contemplated by CAEC's Bylaws and as approved by the Alabama Court of Civil Appeals. In light of this construction of § 37-6-20, plaintiffs cannot sustain viable claims against CAEC on the theory that the statute requires annual cash payments to members (rather than allocation of accounting credits).[10]

---

[9] Defendant has also brought to the Court's attention a ruling entered in the Circuit Court of Coffee County, Alabama in a case styled *Sowell Gregory, Jr. et al. v. Covington Electric Cooperative, Inc.*, Case No. CV-2014-900200.00, which involves claims strikingly similar to those asserted here. On May 1, 2015, an Alabama circuit judge held that "the allocation of credits, as opposed to cash, is not a violation of the statute in question and complies with the contract formed by the bylaws. Therefore there can be no claim for which relief can be granted based upon the argument that the statute or bylaws have been violated." (Doc. 27, Exh. B, at 2.) Three months later, the trial judge presiding over the *Gregory* matter vacated the order of dismissal based on allegations of partiality arising from the fact that the judge's stepfather is a trustee/board member of another Alabama electric cooperative facing similar legal challenges. (Doc. 33, Exh. A.) In vacating the dismissal order and recusing himself, the *Gregory* judge made clear that neither he nor any of his family members had a financial interest in the Coffee County action, that neither his stepfather nor the cooperative with which his stepfather is affiliated were involved in the *Gregory* litigation, and that he had no bias or prejudice that would disqualify him from serving as a judge in that case. (*Id.*) Nonetheless, he did recuse himself and vacate the dismissal order. Plaintiffs have neither cited nor furnished the Court with copies of any Alabama trial court rulings contrary to *Gregory*.

[10] In reaching this conclusion, the Court has carefully considered plaintiffs' counterarguments. For example, plaintiffs point to other states' electric cooperative statutes, observing that the legislatures of certain other states (such as Tennessee, which plaintiffs highlight in their brief) have drafted statutory language specifically authorizing the use of patronage credits as an alternative method of distribution. (*See* doc. 25, at Exhs. B & C.) But the Tennessee statute went into effect in 1988, whereas the Alabama statute was enacted in 1939. Plaintiffs do not explain how a 1988 Tennessee statute sheds light on the Alabama legislature's intent nearly a half century earlier. More broadly, plaintiffs identify no canon of statutory construction under which a legislature's intent may be gleaned from looking at statutes enacted by some other legislature at some other time, absent any evidence of "common drafting heritage"
(Continued)

### C. *CAEC Bylaws Allow Use of Capital Credits in Lieu of Refunds.*

As discussed *supra*, the Court finds as a matter of statutory interpretation that Alabama Code § 37-6-20 does not require electric cooperatives like CAEC to distribute Excess Revenues to members in the form of annual cash payments. Because plaintiffs' Complaint is expressly tethered to the notion that the statute does in fact require cash distributions (as opposed to distribution via accounting credits to members' capital accounts), defendant's Motion to Dismiss is properly granted. That said, even if plaintiffs were correct that § 37-6-20 required distributions to be made in cash, the Complaint would still fail to state a claim upon which relief can be granted, and dismissal would remain proper.

To understand this determination, one need look no further than CAEC's Bylaws. Again, it is undisputed that those Bylaws describe a system under which CAEC issues patronage credits (including, though perhaps not limited to, Excess Revenues) to each member's capital account. The Bylaws further contain the following provision:

---

beyond counsel's unvarnished say-so. In Exhibit C, plaintiffs theorize that the fact that six other states have amended their statutes to allow for capital credits "is an admission that the original versions … did not." (Doc. 25, Exh. C, at 5.) There has certainly been no "admission" by the Alabama legislature. Moreover, it is equally plausible (if not more so) that these states amended their electric cooperative statutes to eliminate plaintiff-generated confusion and to prevent overzealous plaintiffs from seizing on a capital credit mechanism that the legislatures had never intended to prohibit in the first place. (The Alabama legislature may have seen no reason to clarify its statute given the Alabama Court of Civil Appeals' opinion in *Mon-Cre* that § 37-6-20, as presently formulated, allows distribution of Excess Revenues via accounting credits.) Tellingly, in its multistate survey, plaintiffs identify not a single appellate authority from any of these other states construing their parallel excess revenue statutes in the manner that plaintiffs would have this Court interpret § 37-6-20. Next, plaintiffs rely on the different language found in an agricultural cooperative statute codified at Alabama Code § 2-10-103 as proof that the Alabama legislature intended to forbid distributions by capital credit in the electric cooperative statute. But the agricultural cooperative statute does not provide the stark contrast that plaintiffs ascribe to it; rather, plaintiffs are comparing apples to oranges. Nothing in § 2-10-103 would support a reasonable inference that the Alabama legislature intended § 37-6-20 to mandate cash payouts. Much like in § 2-10-103, an Alabama statute governing electric cooperatives authorizes them "[t]o do and perform any and all other acts and things and to have and exercise any and all other powers which may be necessary, convenient or appropriate to accomplish the purposes for which the cooperative is organized," Ala. Code § 37-6-3(23), which is surely broad enough to include the issuance of patronage credits in members' capital accounts.

> "All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital."

The Bylaws also demonstrate recognition by CAEC and its patrons that the Bylaws "shall constitute and be a contract between the Cooperative and each patron, and both the Cooperative and the patrons are bound by such contract." Plaintiffs readily acknowledge in their pleadings that the Bylaws represent a binding contract between CAEC and its members.[11]

The significance of the above-quoted Bylaws language is this: As part of their contract with CAEC, plaintiffs (and all other members of the cooperative) agreed that funds credited to their individual capital accounts were the same as if CAEC had paid them out in cash in compliance with a legal obligation and plaintiffs had then returned those funds to CAEC as capital contributions. So the contract sets forth plaintiffs' agreement that amounts credited to their capital accounts are the equivalent of cash payouts that plaintiffs then return to CAEC for capital. Thus, even if § 37-6-20 required CAEC to distribute Excess Revenues to plaintiffs in cash each year, the Bylaws say that everyone agrees the members' capital account credits are effectively cash payouts voluntarily returned by the members to CAEC as capital contributions. This provision of the Bylaws would, on its face, eradicate any violation of § 37-6-20 caused by CAEC's distribution of accounting credits rather than cash, inasmuch as the members had agreed to plow any cash they received back into the cooperative as capital. Seen through this lens, the conduct plaintiffs ascribe to CAEC does not violate the statute because the Bylaws erase the distinction between cash payouts and capital account credits by saying that even if plaintiffs were statutorily entitled to the former, plaintiffs authorize CAEC to use them as the latter. There can be no violation of § 37-6-20 where CAEC is crediting Excess Revenues in the manner that plaintiffs themselves have authorized it to do, even if CAEC were required by statute to make

---

[11] In Count Two of their Complaint, plaintiffs purport to bring a state-law breach of contract claim against CAEC, relying on the Bylaws. Specifically, the Complaint includes allegations that "[a] written contract exists between Plaintiffs and Defendant and between each putative class member and Defendant through Defendant's bylaws." (Doc. 1, Exh A, ¶ 27.) Plaintiffs further allege in their Complaint that CAEC breached the contract created by those bylaws "by retaining excess revenues in violation of Section 37-6-20." (*Id.*, ¶ 30.) Given the express allegations of their Complaint, plaintiffs cannot (and do not) deny that the Bylaws create a legally binding contract between themselves and CAEC.

cash payouts.[12]  Accordingly, the Court finds that even if § 37-6-20 is properly interpreted as requiring cash distribution of Excess Revenues each year, plaintiffs and other CAEC members have contracted away that right by agreeing in the Bylaws to return such cash payments to CAEC as capital contributions, with the result being that no cash changes hands and CAEC records those contributions as accounting credits.  In that scenario, there is no statutory violation, and plaintiffs' claims fail as a matter of law.  Defendant's Motion to Dismiss is properly granted on this separate, independent ground, as well.[13]

---

[12]    Once again, plaintiffs' counterarguments are not persuasive.  Plaintiffs would have the Court jettison this feature of the Bylaws as being "in conflict with the statute" and therefore "void."  (Doc. 25, at 21.)  It is true, of course, that under Alabama law "contracts specifically prohibited by law, or the enforcement of which violates the law … are void and unenforceable."  *Carraway Methodist Health Systems v. Wise*, 986 So.2d 387, 396 (Ala. 2007) (citations omitted).  But nothing in the challenged provision of the Bylaws conflicts with plaintiffs' interpretation of § 37-6-20.  If plaintiffs are correct, § 37-6-20 says that Excess Revenues must be distributed in cash to members.  Even under plaintiffs' reading, § 37-6-20 does not impose any constraints on what members may do with those funds after they receive them.  In other words, nothing in plaintiffs' interpretation of § 37-6-20 would bar members from voluntarily returning all Excess Revenues to CAEC as capital contributions.  The agreed-upon Bylaws specify that credits in members' capital accounts will be treated as if they were mandatory cash payouts that the members then voluntarily paid back to CAEC as capital.  Such an arrangement would not contravene plaintiffs' interpretation of § 37-6-20, which in no way inhibits members from returning distributions to the cooperative for capital credits; therefore, that section of the Bylaws is not void as being in conflict with the statute.  Nor do plaintiffs strengthen their position by arguing that "whether, when, and how this refund allegedly occurs is a fact dependent analysis inappropriate for adjudication at this early juncture."  (Doc. 25, at 22.)  Again, the Complaint and related filings are crystal clear that plaintiffs' theory of relief is that § 37-6-20 requires CAEC to distribute Excess Revenues to members in the form of cash (rather than accounting credits).  The Complaint is not grounded in a theory that CAEC has improperly calculated those credits or distributed them at improper intervals; therefore, the fact issues identified in plaintiffs' brief are of no consequence to the legal theory to which plaintiffs' pleadings have staked their case.

[13]    The now-vacated *Gregory* decision from Coffee County discussed in footnote 9, *supra*, reached the same conclusion on this point.  That circuit judge wrote as follows: "This court does not believe it is against public policy for members of cooperatives to agree by contract to contribute capital to the same entity providing them electricity and over which they have part ownership and control.  The court is of the opinion that the statute does not prohibit Plaintiffs from agreeing to donate capital to the cooperative."  (Doc. 27, Exh. B, at 2.)

### D. *Plaintiffs' Motion for Interlocutory Appeal.*

Also pending is Plaintiffs' Motion for Certification of Interlocutory Appeal (doc. 36). That Motion is aimed at the jurisdictional ruling of August 11, 2015, wherein the Court adopted the Report and Recommendation's conclusion that CAEC properly removed this action under the federal officer removal provisions of 28 U.S.C. § 1442(a).  Of course, one criterion for certification of an issue for interlocutory appeal is that "immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see also McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) ("This is not a difficult requirement to understand.  It means that resolution of a controlling legal question would serve to avoid a trial or otherwise substantially shorten the litigation.").  The Court finds that this element is not present here.  After all, at the time plaintiffs moved for certification of the jurisdictional issue for interlocutory appeal, CAEC's Motion to Dismiss on the merits had already been briefed and was ripe for adjudication.  Under these circumstances, the most efficient means of advancing the ultimate termination of the litigation was to rule on the Motion to Dismiss, after which plaintiffs are free to appeal both the jurisdictional and the merits determinations if they choose, rather than engaging in inefficient piecemeal appeals of jurisdictional and merits rulings.  Accordingly, the Motion for Certification of Interlocutory Appeal is **denied**.[14]

---

[14]     Notwithstanding this ruling, several statements in Plaintiffs' Motion for Certification of Interlocutory Appeal warrant clarification.  First, plaintiffs state that the August 11 Order "is the first and only holding by any court, in any jurisdiction, that federal jurisdiction of claims against an electric cooperative exists pursuant to the Federal Officer Removal statute, 28 U.S.C. § 1442." (Doc. 36, at 1.)  Plaintiffs reinforce the point by declaring, "The Order is the first of its kind." (*Id.* at 3.)  Such rhetoric is demonstrably incorrect.  *See Kritner v. Arab Elec. Co-op.*, 2015 WL 2354414, *4 (N.D. Ala. May 14, 2015) (finding that Alabama electric cooperative properly removed action pursuant to § 1442(a) in patronage refund context); *Lake v. Marshall-DeKalb Elec. Co-op.*, 2015 WL 2354384, *4 (N.D. Ala. May 14, 2015) (same).  It also bears noting that plaintiffs never cited any holding by any court, in any jurisdiction, in which § 1442(a) removal jurisdiction had been denied as to an electric cooperative in analogous circumstances.  Second, the delegation argument presented on pages 6 and 7 of the Motion for Certification appears to be brand new.  Certainly, it is nowhere to be found in plaintiffs' Objection to the Report and Recommendation, and plaintiffs never presented it to this Court until now. (*See* doc. 32, at 5-7.)  Third, on page 9 and footnote 1 of their Motion, plaintiffs fault the August 11 Order for not addressing objections that plaintiffs never raised and for not combing plaintiffs' briefs preceding entry of the Report and Recommendation in search of meritorious (Continued)

**III.    Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendant's Motion to Dismiss (doc. 2) is **granted**, and this action is **dismissed with prejudice** pursuant to Rule 12(b)(6), Fed.R.Civ.P.;

2. Plaintiffs' Motion for Certification of Interlocutory Appeal (doc. 36) is **denied**; and

3. A separate judgment will enter.

DONE and ORDERED this 4th day of September, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

arguments that plaintiffs had omitted from their Objections.  It is plaintiffs' burden to identify and articulate their objections to the Report and Recommendation.  They cannot shift this burden to the Court through the casual, prophylactic measure of incorporating by reference all of their prior briefs.  The Magistrate Judge told them so.  Indeed, the "Notice of Right to File Objections" section of the Report and Recommendation cautioned that the objecting party must "file specific written objections" and that "[a]n objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific." (Doc. 28, at 23-24.)  If plaintiffs wished to be heard on the "conflicting regulation" aspect of the Report and Recommendation, then it was incumbent on them to articulate a specific objection relating to same, without leaving it to this Court to sift through their prior filings and guess whether and how they might be dissatisfied with the Report and Recommendation's treatment of that issue.  Fourth, plaintiffs' suggestion that there can never be conflict between Alabama Code § 37-6-20 and 7 C.F.R. § 1717.617(a) is unpersuasive.  Plaintiffs read § 37-6-20 as mandating cash payments of Excess Revenues to members, while § 1717.617(a) sets a requirement that borrowers such as CAEC refrain from making cash patronage refunds that reduce the borrower's equity below 30% of total assets, without approval from the Rural Utilities Service.  Of course, approval may or may not be granted, but the specter of tension between § 37-6-20 (at least in plaintiffs' reading of it) and the 30% equity requirement of § 1717.617(a) creates at least a plausible scenario of conflict between the two, and therefore a colorable defense of conflict preemption.  CAEC does not have to prove – and the Court does not have to find at this stage – an actual conflict between these provisions, only that CAEC has a colorable defense.  Defendant adequately made that showing.  In deeming the colorable federal defense prong satisfied, the August 11 Order did not hold that there was an actual conflict between the two provisions, as plaintiffs now suggest.  Rather, the August 11 Order found only that "§ 37-6-20 appears to be in conflict with many applications of § 1717.617(a)" and noted, correctly, that plaintiffs had lodged no objection to the Report and Recommendation on this point.  (Doc. 34, at 9.)  The foregoing clarifications may benefit all concerned should this case move forward on appeal.